IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 90,198

STATE OF KANSAS,
*Appellee,*

v.

JONATHAN D. CARR,
*Appellant.*

SYLLABUS BY THE COURT

1.

Section 1 of the Kansas Constitution Bill of Rights acknowledges a person's inalienable right to life, but that right is not absolute or nonforfeitable. Once a defendant has been convicted of capital murder beyond reasonable doubt, the defendant forfeits his or her natural rights under section 1 ("among which are life, liberty, and the pursuit of happiness") and the state may impose punishment for that crime pursuant to the provisions of Kansas' capital sentencing scheme.

2.

Once a defendant has been lawfully convicted of capital murder, the imposition of a capital sentence does not implicate section 1 of the Kansas Constitution Bill of Rights. However, other constitutional guarantees, including those contained in sections 9 and 10 of the Kansas Constitution Bill of Rights, continue to regulate the State's authority to punish and guard against arbitrary applications of such authority.

1

3.

As used in section 5 of the Kansas Constitution Bill of Rights, the term "jury" denotes a legally selected group of persons sworn to determine issues of fact and return a decision based on the evidence and in accordance with the law as instructed.

4.

The process of death qualification under K.S.A. 22-3410 removes only those prospective jurors who are excluded from the constitutional definition of a "jury," and therefore neither the statute nor the process of death qualifying the jury implicate any right protected under section 5 of the Kansas Constitution Bill of Rights.

5.

Section 5 of the Kansas Constitution Bill of Rights does not require that juror qualification or selection standards enacted by the Legislature be affirmatively authorized by the common law. Rather, that provision merely preserves the right to jury trial as it existed at common law when the Kansas Constitution was adopted.

6.

Under the law of the case doctrine, when a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.

7.

The avoidance-of-arrest statutory aggravating circumstance, K.S.A. 2020 Supp. 21-6624(e), effectively channels the discretion of the sentencer and is not facially overbroad.

8.

In Kansas capital sentencing proceedings, the Confrontation Clause of the Sixth Amendment to the United States Constitution applies only to testimonial hearsay relevant to the jury's eligibility decision, i.e., evidence relevant to the existence of one or more statutory aggravating circumstances. A defendant's confrontation rights do not extend to, and are not implicated by, testimonial hearsay offered to impeach or rebut defendant's mitigation witnesses.

9.

An expert's reliance on testimonial hearsay does not constitute a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution per se. Instead, the controlling question is whether the expert is testifying as a witness in his or her own right or testifying as a mere "conduit" for the testimonial hearsay.

10.

In the penalty phase of a capital murder trial, the district court does not err by instructing the jury that the appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.

11.

The district court's failure to instruct the jury that it must find defendant was at least 18 years old at the time of the offense, as a condition precedent to imposing the death penalty, constitutes error. But such error is subject to a harmless error analysis.

3

12.

When a reviewing court concludes beyond a reasonable doubt that the omitted element of a crime from a jury instruction was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.

13.

An appellate court applies a two-step framework in analyzing claims of prosecutorial error. Under the first step, the court considers whether prosecutorial error occurred by determining whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to argue the State's case and attempt to obtain a verdict in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the court advances to the second step and determines whether the error prejudiced the defendant's due process right to a fair trial.

14.

When analyzing prosecutorial error claims that implicate both constitutional and nonconstitutional claims of error, the court need only address the more demanding federal constitutional error standard. Under the federal constitutional error standard, prosecutorial error is harmless if the State demonstrates beyond a reasonable doubt the error complained of did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict.

15.

In analyzing claims of prosecutorial error in the penalty phase of capital proceedings, the overwhelming nature of evidence is to be considered, but its impact is limited. To the extent there was constitutional error, the question is not what effect the error might generally be expected to have upon a reasonable jury but what effect it had

upon the actual verdict in the case at hand. The inquiry, in other words, is not whether, in a trial that occurred without the error, a verdict for death would surely have been rendered, but whether the death verdict actually rendered in this trial was surely unattributable to the error. If more than one prosecutorial error occurred in the proceedings, the court considers the net prejudicial effect of those errors using the same federal constitutional error standard applied to the individual errors.

16.

Prosecutorial error in the penalty-phase of a capital trial is harmless when there is no reasonable possibility the error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict.

17

Generally, counsel may not make assertions of fact in questions to a witness without a good-faith basis for believing the asserted matter to be true. A prosecutor's duty to furnish an explicit good-faith basis for questions is triggered only upon a defense objection.

18.

When the defendant fails to lodge a contemporaneous objection to the admission of evidence, K.S.A. 60-404 generally precludes an appellate court from finding error. However, in a death penalty appeal, the contemporaneous objection rule is generally superseded by our statutory duty to notice unassigned errors under K.S.A. 2020 Supp. 21-6619(b). But while K.S.A. 2020 Supp. 21-6619(b) compels our review of all issues briefed on appeal, it does not require that we treat the record other than as it is presented to us.

19.

An adequate factual record is required to conduct meaningful appellate review of an issue. A party challenging the ruling of the district court is responsible for developing an adequate record for appeal.

20.

It is well established that the fundamental rule in closing arguments is that a prosecutor must confine his or her comments to matters in evidence. When the prosecutor argues facts that are not in evidence, prosecutorial error occurs.

21.

In general, fair comment on trial tactics is allowed in closing argument so long as care is taken not to denigrate opposing counsel. However, any sort of attack or disparaging comment directed at opposing counsel during closing arguments is strongly discouraged and could jeopardize the verdict.

22.

The traditional rubric for considering a motion for mistrial can be applied to such a motion brought during a penalty phase proceeding. K.S.A. 22-3423(1)(c) permits a district court to declare a mistrial because of prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution. Applying this statute, a district court must engage in a two-step analysis. First, the district court must decide if there is some fundamental failure of the proceeding. If so, in the second step of the analysis, the district court must assess whether it is possible to continue the trial without an injustice. This means that if there is prejudicial conduct, the district court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the district court must determine whether the degree of prejudice results in an injustice and, if so, declare a

6

mistrial. In analyzing whether it is impossible to proceed without an injustice after a fundamental failure in the proceedings, a court must assess whether the failure affected a party's substantial rights, which means it will or did affect the outcome of the trial in light of the entire record.

23.

On appeal, a district judge's decision denying a motion for mistrial is reviewed for abuse of discretion. An abuse of discretion occurs when: (1) no reasonable person would take the view adopted by the district court; (2) the ruling is based on an error of law; or (3) the exercise of discretion is based on an error of fact.

24.

Applying the abuse of discretion standard of review to a motion for mistrial, an appellate court focuses on the two questions analyzed by the district court and asks: (1) Did the district court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the district court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis as the district court, applying K.S.A. 2020 Supp. 60-261 and K.S.A. 60-2105 or else the constitutional harmless error standard, depending on the nature of the right allegedly affected.

25.

In the penalty phase of a capital proceeding where a defendant presents evidence of a mitigating circumstance, the prosecution is permitted to cross-examine defense witnesses as to relevant facts and to introduce relevant evidence in order to rebut the existence of the mitigating circumstance.

7

26.

When a defendant places his or her character at issue during the penalty phase of a capital trial, the prosecution is entitled to respond with character evidence of its own. The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it undermines defendant's claim that his or her good character weighs in favor of mercy. Once the defendant's general character is in issue, the prosecutor is entitled to rebut with evidence or argument suggesting a more balanced picture of his or her personality. The prosecution need only have a good-faith belief that the conduct or incidents about which it inquires actually took place.

27.

The test prescribed for a constitutional violation attributable to evidence improperly admitted at a capital-sentencing proceeding is whether the evidence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.

28.

Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such that they cannot be determined to be harmless, even though individually those errors are harmless. In assessing cumulative error in the penalty phase of a capital trial, the errors aggregated include any errors in the guilt-phase proceedings that the court determines must be considered in conjunction with the penalty-phase errors. In addition, the errors aggregated include those penalty-phase errors assumed by the court. And they include penalty-phase jury instruction errors not raised in the district court that are not clearly erroneous standing alone.

29.

When reviewing cumulative error in a capital penalty-phase proceeding, the court's focus is on the errors' cumulative effect on the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. In other words, we are looking for the errors' effect in their aggregate, recognizing errors can differ in their individual or cumulative effect. Ultimately, the court must determine whether there is a reasonable possibility the errors' cumulative effect, viewed in light of the record as a whole, affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict.

Appeal from Sedgwick District Court; PAUL W. CLARK, judge. Opinion on remand filed January 21, 2022. Affirmed.

*Clayton J. Perkins*, of Capital Appellate Defender Office, and *Sarah Ellen Johnson*, of the same office, argued the cause, and *Meryl Carver-Allmond*, of the same office, was with them on the briefs for appellant.

*David Lowden*, special appointed prosecutor, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

*Alice Craig*, of Lawrence, was on the brief for amicus curiae Midwest Innocence Project joined by Witness to Innocence and Floyd Bledsoe.

*Sharon Brett*, of ACLU Foundation of Kansas, of Overland Park, and *Cassandra Stubbs*, pro hac vice*,* and *Brian W. Stull*, pro hac vice, of American Civil Liberties Union Foundation, of Durham, North Carolina, were on the brief for amici curiae Concerned Conservatives About the Death Penalty, Kansas Coalition Against the Death Penalty, Dalton Glasscock, Steve Becker, Al Terwelp, Bob Weeks, Carolyn Zimmerman, Celeste Dixon, Bill Lucero, Msgr. Stuart Swetland, Catholic Mobilizing Network, Dominican Sisters and Associates of Peace of the Roman Catholic Church, Mount St. Scholastica, Sisters of Charity of Leavenworth Office of Justice, Peace, and Integrity of Creation, Sister Christina Meyer, Bishop Ruben Saenz Jr., Robert Sanders, Michael Birzer, and the American Civil Liberties Union and ACLU of Kansas.

*Elizabeth Cateforis*, Clinical Professor of Law, University of Kansas School of Law, of Lawrence, and *Alexis J. Hoag*, Lecturer and Associate Research Scholar, pro hac vice, Columbia Law School, of New York, New York, were on the brief for amici curiae of the group of law professors and scholars.

*Rebecca E. Woodman*, of Kansas City, Missouri, and *Jin Hee Lee*, pro hac vice, of NAACP Legal Defense and Education Fund, Inc., of New York, New York, and *Natasha C. Merle*, pro hac vice, and *Steven Lance*, pro hac vice, of the same office, were on the brief for amici curiae NAACP Legal Defense and Educational Fund, Inc.

The opinion of the court was delivered by

WALL, J.: We affirm Jonathan D. Carr's death sentence, concluding he is not entitled to relief on the penalty-phase issues before us on remand from the United States Supreme Court. See *Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (*Carr*).

FACTUAL AND PROCEDURAL BACKGROUND

In our previous decision, we affirmed one of J. Carr's capital murder convictions but vacated his death sentence after concluding his Eighth Amendment right to an individualized sentencing determination was violated when the district court refused to sever the trial's penalty phase from that of his codefendant brother, Reginald Carr. See *State v. Carr*, 300 Kan. 340, 371, 329 P.3d 1195 (2014) (*J. Carr*), *rev'd and remanded* 577 U.S. 108 (2016). In a companion decision, the court also vacated R. Carr's death sentence for failure to sever the penalty phase. *State v. Carr*, 300 Kan. 1, 315, 331 P.3d 544 (2014) (*R. Carr I*), *rev'd and remanded sub nom. Carr*, 577 U.S. 108 (2016).

10

Our disposition made it unnecessary to review all alleged penalty-phase errors, although we considered some for guidance on remand. Among those, we noted the same Eighth Amendment individualized sentencing concerns were implicated when the district court failed to instruct the jury that mitigating circumstances need not be proved beyond a reasonable doubt. That same instructional issue proved dispositive in the court's decision to vacate the death sentence in another death penalty case. See *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014) (*Gleason I*), *rev'd and remanded sub nom. Carr*, 577 U.S. 108 (2016).

The United States Supreme Court granted the State's petition for writ of certiorari on those two Eighth Amendment issues in the *R. Carr I*, *J. Carr*, and *Gleason I* cases. It disagreed with our Eighth Amendment analysis on both issues, holding that the joint penalty-phase trial did not violate the Carrs' Eighth Amendment rights, and that the Eighth Amendment to the United States Constitution does not require district court judges to instruct Kansas penalty-phase juries that mitigating factors need not be proved beyond a reasonable doubt. *Carr*, 577 U.S. at 122, 126.

Shortly after that decision but before the United States Supreme Court issued its mandate, R. Carr filed a motion with our court arguing that the alleged instructional error (the district court's failure to instruct jurors that the existence of mitigating factors need not be proved beyond a reasonable doubt) required his death sentence to be vacated under state law. In his separate appeal, J. Carr also requested this court rule on the instructional issue as a matter of state law. On the same day, he asked for additional briefing on issues left undecided in our earlier decision. The State filed responses.

We ordered supplemental briefing addressing the remaining issues, including cumulative error. At the State's request, two extensions occurred and were granted pursuant to Supreme Court Rule 5.02 (2021 Kan. S. Ct. R. 32). The parties

simultaneously filed their supplemental briefs on November 7, 2016. We heard oral argument in both cases on May 4, 2017.

In April 2019, this court filed its opinion in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 638, 440 P.3d 461 (2019), holding "section 1 [of the Kansas Constitution Bill of Rights] establishes the judicial enforceability of rights that are broader than and distinct from the rights described in the Fourteenth Amendment." In response to that legal development, the defendants in all the then-pending capital appeals sought leave to raise and brief a new issue challenging the constitutionality of the death penalty under section 1 of the Kansas Constitution Bill of Rights. R. Carr and J. Carr each made this request in motions filed on May 7, 2019.

On June 19, 2019, after having received responses from the State, we granted the defendants, including R. Carr and J. Carr, leave to file supplemental briefing to address "what effect, if any, the decision in *Hodes & Nauser v. Schmidt* . . . has on the issue of whether the Kansas death penalty is unconstitutional under § 1 of the Kansas Constitution Bill of Rights."

R. Carr and J. Carr each filed a supplemental brief on August 16, 2019. In each case, the State filed its brief on October 15, 2019. J. Carr filed a reply brief on November 7, 2019, and R. Carr followed suit the next day.

On February 18, 2021, we again scheduled both R. Carr's and J. Carr's cases for oral argument. Various amici curiae sought and were granted permission to file briefs.

In addition, the NAACP Legal Defense and Educational Fund Inc. (LDF) sought leave to participate in J. Carr's oral argument as a separately represented amicus curiae. The LDF argued that Kansas' death-sentencing scheme violates the "inviolate" right to

trial by jury under section 5 of the Kansas Constitution Bill of Rights. We denied the LDF's motion to participate in oral argument but ordered the parties in J. Carr's case to be prepared to address the issue at oral argument.

As with our previous decisions, this case necessarily covers many issues we addressed in *State v. Carr*, 314 Kan. ___ (No. 90,044, this day decided) (*R. Carr II*), released today. We pause briefly to explain the variance between our opinion in *R. Carr II* and here. As noted, many of the same issues were raised by both defendants. And where only one defendant raised an issue, but the challenge could apply equally to both defendants, we have generally noticed the issue as unassigned error for the other pursuant to K.S.A. 2020 Supp. 21-6619(b). Where the issues are substantially similar, we have set forth the reasoning supporting our holdings in *R. Carr II* and summarize that reasoning here as applicable.

However, not all the issues raised by R. Carr and J. Carr are identical. R. Carr raised two issues unique to his appeal—one challenging evidence he claims was improperly admitted against him and the other involving the exclusion of evidence he sought to have admitted. We provide no further rulings on the merits of those issues here. Similarly, J. Carr raises several claims unique to his case that are addressed only in this opinion, including additional claims of prosecutorial error and two claims of error related to the district court's denial of his motions for mistrial.

To the extent possible, we retain the issue numbering applied in our previous decision, although some are discussed in a different order. See *J. Carr*, 300 Kan. at 368-71. The facts were set forth fully in this court's original decision. *R. Carr I*, 300 Kan. at 17-44, 258-75. In the "Discussion" section to follow, we highlight certain facts necessary to resolve the issues we consider today.

DISCUSSION

For purposes of clarity and organization, we first address the constitutional challenges R. Carr and J. Carr raised under the Kansas Constitution Bill of Rights. Then, we address J. Carr's motion to apply state law to the burden of proof instruction for mitigating circumstances. Finally, we examine the remaining claims of penalty-phase error, including cumulative error.

I.    *Kansas' Capital Sentencing Scheme Does Not Violate Section 1 of the Kansas Constitution Bill of Rights*

Both R. Carr and J. Carr, relying on *Hodes*, claim section 1 establishes an absolute, nonforfeitable right to life, and Kansas' capital sentencing scheme unconstitutionally infringes upon this right.

After careful examination of the historical record and the documents and writings that inspired the drafters of the Kansas Constitution, we concluded in *R. Carr II* that section 1 recognizes an "inalienable" right to life, meaning it cannot be assigned or transferred to another individual, but that the right is not absolute or nonforfeitable. See *R. Carr II*, 314 Kan. at ___, slip op. at 37-40. We held that once a defendant has been convicted of capital murder beyond reasonable doubt, the defendant forfeits his or her natural rights under section 1 ("among which are life, liberty, and the pursuit of happiness") and the state may impose punishment for that crime pursuant to Kansas' capital sentencing scheme. See 314 Kan. at ___, slip op. at 40.

In so holding, we do not mean to suggest the state's power to punish is unabated upon a defendant's forfeiture of natural rights under section 1. To the contrary, "other constitutional guarantees, including but not limited to those contained in sections 9 and

14

10, continue to regulate the state's authority to punish and guard against arbitrary applications of such authority." 314 Kan. at ___, slip op. at 40.

But J. Carr's asserted right to, or declared interest in, an absolute, nonforfeitable right to life is not included within the guarantees or protections of section 1. See 314 Kan. at ___, slip op. at 37-40. The natural right to life is forfeitable, and the government's imposition of the death penalty pursuant to Kansas' capital sentencing scheme does not implicate the "inalienable" right to life protected under section 1. See 314 Kan. at ___, slip op. at 40.

Accordingly, the jury's capital sentencing verdict in J. Carr's case satisfies constitutional scrutiny under section 1 of the Kansas Constitution Bill of Rights.

II. *Death Qualification of Jurors Under K.S.A. 22-3410 Does Not Violate Section 5 of the Kansas Constitution Bill of Rights*

In an amicus brief filed in J. Carr's case, the NAACP Legal Defense and Educational Fund, Inc. (LDF) raises a state constitutional challenge to the practice of "death qualifying" juries in Kansas—the process of removing prospective jurors for cause, pursuant to K.S.A. 22-3410, when their conscientious objection to capital punishment substantially impairs their ability to fulfill the oath and obligations of a juror.

We noticed this same issue as unassigned error in R. Carr's companion appeal, pursuant to K.S.A. 2020 Supp. 21-6619(b). See 314 Kan. at ___, slip op. at 41. There, based on the plain meaning and historical record, we construed the term "jury," as used in section 5, to denote a legally selected group of decision-makers sworn to determine issues of fact and return a verdict based on the evidence and the law as instructed. See 314 Kan. at ___, slip op. at 44. The process of death qualification under K.S.A. 22-3410, as limited by the Eighth Amendment to the United States Constitution, removes only those

prospective jurors who cannot fulfill these obligations due to conscientious objection to the death penalty, i.e., those prospective jurors excluded from the constitutional definition of a "jury." See 314 Kan. at ___, slip op. at 45, 49. Thus, the process of death qualification facilitates the very jury trial right guaranteed by section 5. See 314 Kan. at ___, slip op. at 49.

Moreover, section 5 guarantees only those jury trial rights that existed at common law when the Kansas Constitution was adopted in 1859. See *Kimball and others v. Connor, Starks and others*, 3 Kan. 414, 432 (1866) ("Trial by jury is guaranteed only in those cases where that right existed at common law."). At the time section 5 was adopted, the common law did not preclude, and in fact authorized, the process of death qualification. See *R. Carr II*, 314 Kan. at ___, slip op. at 47. For these reasons, the practice of death qualifying juries under K.S.A. 22-3410 does not violate section 5 of the Kansas Constitution Bill of Rights.

Finally, the LDF also claims that death qualification under K.S.A. 22-3410 disproportionately impacts the racial composition and biases of juries in capital proceedings. As we noted in our companion decision today, the absence of factual findings in the record of these joint proceedings precludes meaningful review of this challenge. See 314 Kan. at ___, slip op. at 48. This holding is bolstered by our previous decision in *J. Carr*, where we affirmed the district court's rulings on the for-cause challenges J. Carr had contested on appeal. In other words, we previously determined substantial competent evidence supported the district court's conclusion that the individuals empaneled as members of J. Carr's jury were impartial and qualified. See *J. Carr*, 300 Kan. at 356-57; *R. Carr I*, 300 Kan. at 114-24. This holding, which is now the law of the case, further suggests the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor, including the State's ability to death qualify jurors under K.S.A. 22-3140. See K.S.A. 2020 Supp. 21-6619(c)(1)

16

(requiring court to determine whether sentence was imposed under such improper circumstances).

Based on the foregoing, the process of death qualification under K.S.A. 22-3410 does not violate section 5 of the Kansas Constitution Bill of Rights, and the jury's death sentence verdict survives constitutional scrutiny under this provision.

## III. *The Motion and State Law Challenge to the Mitigating Circumstances Instruction*

We next address J. Carr's pending motion to apply state law to the burden of proof instruction on mitigating circumstances. The equivalent challenge raised under the federal Constitution was designated P10 in our earlier decision.

We deny the motion. It is an inappropriate procedural vehicle for raising a new, state-law instruction issue for the first time on remand. See *R. Carr II*, 314 Kan. at ___, slip op. at 51.

However, we reach the merits "given our statutory obligation in capital appeals to both consider 'the question of sentence' and 'notice unassigned errors appearing of record if the ends of justice would be served thereby.'" 314 Kan. at ___, slip op. at 51. We conclude the failure to give the instruction was not error under state law. 314 Kan. at ___, slip op. at 51.

## IV. *The Remaining Penalty-Phase Issues*

Having resolved R. Carr's state constitutional challenges and his motion to consider the instructional challenge under state law, our analysis turns to the remaining penalty-phase issues raised by the defendants.

17

*A. P1/21—Severance*

In our previous decision, we concluded the district court erred by failing to sever the defendants' guilt phase trials under Kansas law. *R. Carr I*, 300 Kan. at 97; *J. Carr*, 300 Kan. at 356. This holding was not disturbed by the United States Supreme Court's subsequent opinion in *Kansas v. Carr*. As such, it is now the law of the case for purposes of this appeal. *State v. Cheeks*, 313 Kan. 60, 66, 482 P.3d 1129 (2021) (Under the law of the case doctrine, when a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.).

J. Carr argues this state-law error continued into the penalty phase. We agree. See *R. Carr II*, 314 Kan. at ___, slip op. at 58. But the State carried its burden to demonstrate the error was harmless and, therefore, it does not require reversal standing alone. There is no reasonable probability the error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See 314 Kan. at ___, slip op. at 61-62 (reasoning the trial record and the United States Supreme Court's conclusion that antagonistic aspects of defendants' mitigation cases did not influence the jury demonstrated the state-law severance error was harmless).

*B. P2—Notice of Aggravating Circumstances*

J. Carr alleges the State failed to give him constitutionally sufficient notice of the aggravating factors it intended to rely on to seek the death penalty, despite complying with K.S.A. 21-4624(a)'s notice requirements. In *R. Carr I*, 300 Kan. at 282, we rejected this argument, citing *State v. Scott,* 286 Kan. 54, 101-02, 183 P.3d 801 (2008) (holding statutorily compliant notice of intent to seek death penalty is sufficient to give defendant

18

meaningful opportunity to respond to statutory aggravating factors). We reaffirmed this holding as the law of the case in *R. Carr II*, 314 Kan. at ___, slip op. at 62.

In our previous decision, we merely referenced this portion of the *R. Carr I* decision "[t]o provide guidance on remand." *J. Carr*, 300 Kan. at 368. We now address this unassigned error on behalf of J. Carr and necessarily hold that he too received constitutionally sufficient notice. See K.S.A. 2020 Supp. 21-6619(b); *R. Carr II*, 314 Kan. at ___, slip op. at 62.

### C.   P3—Channeling of Jury's Discretion

J. Carr originally argued the four aggravating circumstances the State relied upon did not adequately channel the jury's discretion in arriving at the death sentence. Recognizing this as an unassigned error in R. Carr's companion appeal, we rejected the challenge because defendants had not given us cause to revisit our prior holdings in which "'[w]e have rejected the defense arguments advanced here on each of the four aggravators, when those arguments were made on behalf of other death penalty defendants.'" 314 Kan. at ___, slip op. at 63 (quoting *R. Carr I*, 300 Kan. at 283). In addition, we clarified the avoidance of arrest aggravating circumstance, K.S.A. 2020 Supp. 21-6624(e), effectively channels the discretion of the sentencer and is not facially overbroad. See *R. Carr. II*, 314 Kan. at ___, slip op. at 64. As established in *R. Carr II*, there is no constitutional error.

### D.   P4—Unavailability of Transcript of Jury View

R. Carr argued the failure to have a court reporter present at the jury view prevented him from making a record sufficient for meaningful appellate review, violating his rights under the Eighth and Fourteenth Amendments to the United States

Constitution. We concluded in our previous decision there was no error because R. Carr received a reasonably accurate and complete record, and we affirmed that holding today under the law of the case doctrine. *R. Carr I*, 300 Kan. at 284; *R. Carr II*, 314 Kan. at ___, slip op. at 64.

Recognizing this issue as unassigned error on J. Carr's behalf, we arrive at the same conclusion and hold there was no error. See K.S.A. 2020 Supp. 21-6619(b).

### E.   P5—*Constitutional Challenges to K.S.A. 21-4624(c)*

R. Carr claimed hearsay evidence admitted against him under K.S.A. 21-4624(c)'s relaxed evidentiary standard during the penalty phase of his trial violated both the Eighth Amendment's heightened reliability standard and the Confrontation Clause. See *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (testimonial out-of-court statements by witness barred under Confrontation Clause unless witness unavailable, defendant had prior opportunity to cross-examine). We addressed these claims in *R. Carr I*—and referenced that discussion in *J. Carr* solely for purposes of providing guidance on remand. See *R. Carr I*, 300 Kan. at 286-87; *J. Carr*, 300 Kan. at 368-69. See also *R. Carr II*, 314 Kan. at ___, slip op. at 66 (reaffirming *R. Carr I* holding that K.S.A. 21-4624 does not offend the heightened reliability standard; applying law of the case doctrine to prior Confrontation Clause ruling to penalty-phase proceedings to assume R. Carr suffered a Confrontation Clause violation; but holding any error was harmless). Because we affirm J. Carr's sentence and no further guidance is required, we need not further address this evidentiary issue unique to R. Carr's case.

## F. *P6—Exclusion of Mitigating Evidence*

R. Carr argued the district judge erred by excluding testimony addressing the likelihood of parole under an alternate sentence. He also challenged the exclusion of his sister's testimony about what sentence she wanted the jury to impose and how she would be affected if he were executed. In *R. Carr I*, we held the district court correctly excluded R. Carr's likelihood-of-parole evidence as devoid of probative value and discussed the standards that would govern the district court's evidentiary ruling as to the sister's testimony on remand. *R. Carr I*, 300 Kan. at 291-92.

As with the previous issue, we referenced this discussion in *J. Carr* to provide guidance on remand. See *J. Carr*, 300 Kan. at 369; *R. Carr I*, 300 Kan. at 289. Because we are not remanding, we need not further address this evidentiary issue unique to R. Carr's case.

## G. *P7—Agreement of Other Experts*

J. Carr complains his Confrontation Clause rights were violated when the State's rebuttal expert, Dr. Norman Pay, testified that other experts agreed with his opinions about the defendants' positron emission tomography (PET) scans—evidence J. Carr characterizes as testimonial hearsay.

Before addressing the merits of this challenge, we note that today, in *R. Carr II*, we clarified our general pronouncement in *R. Carr I* regarding the application of the Confrontation Clause in the penalty phase of Kansas capital proceedings:

> "With the foregoing in mind, we qualify this court's general pronouncement in *R. Carr* [*I*] (that the Confrontation Clause applies during the penalty phase) by clarifying that in Kansas capital sentencing proceedings, the Confrontation Clause applies only to

evidence relevant to the jury's eligibility decision. A defendant's confrontation rights do not extend to evidence relevant to the jury's selection decision.

"While Kansas' capital sentencing scheme does not contemplate bifurcated *penalty-phase* proceedings (only the guilt phase and penalty phase are bifurcated), district court judges are still well-positioned to delineate between evidence relevant to eligibility and other evidence relevant to selection. Going forward, trial courts in Kansas should apply the Confrontation Clause when the State introduces evidence relevant to the existence of one or more statutory aggravating circumstances. However, when the State introduces or relies on testimonial hearsay during its rebuttal and cross-examination for purposes of controverting or impeaching the testimony of a capital defendant's mitigation witnesses—provided such evidence does not bolster an aggravating circumstance—the Confrontation Clause shall not apply to such evidence. " *R. Carr II*, 314 Kan. at ___, slip op. at 73.

We recognized this qualification could call into question whether the Confrontation Clause applies to Dr. Pay's testimony. 314 Kan. at ___, slip op. at 74. Nevertheless, we assumed, without deciding, that the Confrontation Clause applied.

As to the merits of the challenge, we concluded that Pay's statements were testimonial. See 314 Kan. at ___, slip op. at 79. However, we recognized an expert's reliance on testimonial hearsay alone is not a per se violation of the Confrontation Clause. See 314 Kan. at ___, slip op. at 79. Instead, the Confrontation Clause precludes an expert's reliance on testimonial hearsay where the witness serves as a mere conduit for the opinions of others, rather than conveying his or her own independent judgment. See 314 Kan. at ___, slip op. at 81. Here, the challenged statements did not violate the Confrontation Clause because Pay was not merely acting as a conduit for the opinions of other unavailable expert witnesses, and he provided an independent opinion based on his synthesis of the evidence. See 314 Kan. at ___, slip op. at 82.

22

This holding applies with equal force to J. Carr's case. Because the admission of this testimony did not violate the Confrontation Clause, there is no error.

### H.   P8—Denial of Surrebuttal Testimony

We previously held the district judge abused his discretion in denying a continuance so that defense expert Dr. David Preston could be present for Pay's testimony and then testify in surrebuttal. *R. Carr I*, 300 Kan. at 298; *J. Carr*, 300 Kan. at 369; see *R. Carr II*, 314 Kan. at ___, slip op. at 83. This holding is now the law of the case.

J. Carr contends this error can only be declared harmless under the *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), harmless error test. In his view, the error deprived him of the constitutional right to a fair trial by permitting the State to "gut a major component of his mitigation case immediately before the penalty phase closed" and denied him the "right to rehabilitate his expert." *R. Carr II*, 314 Kan. at ___, slip op. at 84.

Assuming, without deciding, the district court's ruling rose to the level of constitutional error, we hold it does not require reversal because it was harmless under either the constitutional or state statutory harmless error standard. As we noted in the companion case, the district court gave defense counsel an opportunity to interview Pay before cross-examination, and defense counsel effectively cross-examined Pay. See 314 Kan. at ___, slip op. at 84. Defendants' mitigation case was not adversely impacted by the challenged testimony. See 314 Kan. at ___, slip op. at 84.

23

## I. P9—Sentencing on Noncapital Convictions

Defendants requested the district court instruct the jury on the number of years they would be required to serve in prison if not sentenced to death. The court instructed the jury the defendants would not be eligible for parole for between 50 and 268 years. J. Carr argues this violated his Eighth and Fourteenth Amendment rights. R. Carr also argues this failure violated section 9 of the Kansas Constitution Bill of Rights. See 314 Kan. at ___, slip op. at 85. We unanimously rejected the constitutional challenge in our previous decision, which is the law of the case for purposes of this appeal. *R. Carr I*, 300 Kan. at 301.

But in the prior decision, we acknowledged the instructions deviated from our caselaw requiring the district court, upon request, to instruct a jury on the number of years a defendant would be required to serve in prison if not sentenced to death, including the possible prison terms for *each* noncapital charge and the possibility sentences could be served either consecutively or concurrently.

To the extent the lack of specificity in the district court's instruction constitutes error, it was error only under state law. *R. Carr II*, 314 Kan. at ___, slip op. at 85. However, it does not require reversal because there is no reasonable probability it affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstance, i.e., the death sentence verdict. See 314 Kan. at ___, slip op. at 86 (court informed jury about shortest possible non-death sentence and defense counsel argued as mitigation that imprisonment was sufficient to protect public).

24

*J.  P11—"The Crime" in Aggravating Circumstances Instruction*

Penalty-phase Instruction No. 5 told the jury it could find aggravating circumstances existed if defendants committed "the crime" for monetary gain; to evade arrest; or in a heinous, atrocious, or cruel manner. The defendants' claim this permitted the jury to rely on its other non-capital convictions to find an aggravating circumstance. Specifically, J. Carr argues the jury might have considered aggravated robbery or aggravated burglary to be "the crime" when assessing the monetary gain aggravator.

In *R. Carr I*, "this court suggested it may be inadvisable to use the phrase 'the crime' in lieu of 'capital murder' when examining the instruction in isolation, [but] it did not squarely address and reach a holding on the question of error." 314 Kan. at ___, slip op. at 87. After analyzing the written instructions, verdict forms, and clarifying comments from the district judge, we conclude that, "[v]iewed together, the jury instructions made clear 'the crime' in question was capital murder." 314 Kan. at ___, slip op. at 88. Accordingly, we find no error.

*K.  P12—Instruction on the Role of Mercy*

R. Carr argued the district court erroneously instructed the jury that "'[t]he appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.'" *R. Carr I*, 300 Kan. at 307. In *R. Carr I*, we "adhere[d] to our precedent rejecting the argument that equating mercy to a mitigating factor is error at all." 300 Kan. at 307. We maintained this position in *R. Carr II*, 314 Kan. at ___, slip op. at 88.

Recognizing this as an unassigned error on behalf of J. Carr, we reach the same conclusion and find no error.

25

*L. P13—Verdict Forms Instruction*

For the first time on appeal, J. Carr challenges Instruction No. 10, which directed jurors how to use the three verdict forms, each verdict form corresponding to one of the three possible verdicts the jury could reach. The verdict forms recited the proper standard for reaching the verdict, but we determined Instruction No. 10 was erroneous because it "garbled [the] standard by introducing an extra 'not' . . . :  it instructed the jury to reject the death penalty if 'one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances . . . *do not outweigh mitigating circumstances . . . .*' *R. Carr [I]*, 300 Kan. at 310-11." *R. Carr II*, 314 Kan. at ___, slip op. at 89.

Recognizing this issue as unassigned error in R. Carr's appeal, we rejected J. Carr's argument that this issue constituted structural error and concluded the reversibility issue should be analyzed under the clearly erroneous standard applied to unpreserved instruction errors. See 314 Kan. at ___, slip op. at 89. Under that framework, we were "not firmly convinced the error in Instruction No. 10 played any role in the jury's sentencing determination—much less that it 'would have reached a different verdict had the instruction error not occurred.' [*Kleypas II*,] 305 Kan. at 302." 314 Kan. at ___, slip op. at 90.

The same rationale applies equally to J. Carr, and we hold there is no error.

*M. P14—Defendant's Age at the Time of the Capital Crime*

The district court did not instruct the jury to find R. Carr and J. Carr were at least 18 years old at the time of the murders. This was error. See *State v. Cheever*, 295 Kan. 229, 265, 284 P.3d 1007 (2012) (*Cheever I*) (fact defendant was at least 18 years old at

26

time of capital crime necessary to subject defendant to death penalty, within scope of Sixth Amendment protection), *vacated and remanded* 571 U.S. 87, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

We recognize this as an unassigned error in J. Carr's appeal and move to our reversibility inquiry. For omitted elements, "[w]hen a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *State v. Reyna*, 290 Kan. 666, Syl. ¶ 10, 234 P.3d 761 (2010). Here, the uncontroverted trial evidence— including testimony from J. Carr's mother, sister, and an expert witness—established J. Carr was over the age of 18 when the crime occurred. J. Carr did not contest this fact at trial. See *R. Carr II*, 314 Kan. at ___, slip op. at 90. Thus, the error was harmless.

### N. P15—Capital Punishment for Aider and Abettor Under K.S.A. 21-3205

We do not reach the merits of this claim for the same reasons stated in our earlier decision. See *J. Carr*, 300 Kan. at 370; *R. Carr II*, 314 Kan. at ___, slip op. at 94; *R. Carr I*, 300 Kan. at 257, 313.

### O. P16—Capital Punishment for Aider and Abettor Under Section 9

We do not reach the merits of this claim for the same reasons stated in our earlier decision. See *J. Carr*, 300 Kan. at 370-71; *R. Carr II*, 314 Kan. at ___, slip op. at 95; *R. Carr I*, 300 Kan. at 257, 313-14.

*P.    P17—Prosecutorial Error*

In their original appellate briefs, R. Carr and J. Carr alleged numerous prosecutorial errors under the standard in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), *overruled by State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). We apply the refashioned standard announced in *Sherman* because it reflects the proper legal framework for analyzing claims of prosecutorial error and the parties addressed *Sherman* in their supplemental briefs and at oral argument. See *R. Carr II*, 314 Kan. at ___, slip op. at 95.

*Sherman* dictates a two-step process. Under the first step, we consider whether prosecutorial error occurred by determining "whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109; see *State v. Kleypas,* 305 Kan. 224, 316, 382 P.3d 373 (2016) (*Kleypas II*). If there is error, we determine whether the error prejudiced the defendant's due process right to a fair trial. *Kleypas II*, 305 Kan. at 316; *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-7.

In evaluating prejudice here, we apply the constitutional harmlessness test in *Chapman*, 386 U.S. at 24. The K.S.A. 2020 Supp. 60-261 statutory harmlessness test also applies, but when analyzing both constitutional and nonconstitutional error we need only address the more demanding federal constitutional error standard. See *Sherman*, 305 Kan. 88, Syl. ¶ 9. Under that standard, prosecutorial error is harmless if the State demonstrates beyond a reasonable doubt the error complained of did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict. 305 Kan. 88, Syl. ¶ 8.

We are also mindful of the subtle differences the United State Supreme Court has recognized in evaluating the harmlessness of prosecutorial error in death penalty cases. The overwhelming nature of evidence is to be considered, but its impact is limited. To the extent constitutional error exists, the question is not what effect the error might generally be expected to have upon a reasonable jury but what effect it had upon the actual verdict in the case at hand. "'"The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error." [*Sullivan v. Louisiana*,] 508 U.S. [275,] 279 (1993).'" *Kleypas II*, 305 Kan. at 274.

Consequently, "prosecutorial error in the penalty phase of a capital trial is harmless when there is no reasonable possibility the error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict." *R. Carr II*, 314 Kan. at ___, slip op. 96; see *Kleypas II*, 305 Kan. at 316. And if more than one prosecutorial error occurred, we consider the net prejudicial effect using the same *Chapman* inquiry applied to the individual errors. *R. Carr II*, 314 Kan. at ___, slip op. at 96.

In *R. Carr II*, we found two instances of harmless prosecutorial error. First, the prosecutor impermissibly endorsed its rebuttal witness Pay's credibility in closing argument. Specifically, she argued, "But when the *truth* comes out and the doctors come and say, well, you know, these [PET scans] aren't right"—referring to Pay's testimony as the "truth." (Emphasis added.) See 314 Kan. at ___, slip op. at 122. We concluded this was harmless standing alone, reasoning that it appeared to be "just a clumsy effort to turn a phrase," and that "the death penalty verdict 'actually rendered in *this* trial was surely unattributable to the error.'" 314 Kan. at ___, slip op. at 122 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 [1993]).

29

Second, the prosecutor clearly misstated the jury's weighing process by commenting "'you listened to this Court instruct you as to the charge to this jury, that if you should find the *aggravating factors* are outweighed by the mitigating factors, then the sentence shall be death.'" (Emphasis added.) *R. Carr II*, 314 Kan. at ___, slip op. at 130. We concluded this was also harmless because the comment was isolated, the prosecutor correctly described the weighing process elsewhere in her argument, and the jury instructions corrected the misstatement. Nothing in J. Carr's appeal warrants a different result. We conclude these errors were each harmless.

J. Carr raises three additional claims of prosecutorial error unique to his case that were not addressed in *R. Carr II*. We explore each in turn.

*1.  Cross-examination Questions Propounded to Mitigation Witnesses*

J. Carr contends the prosecutor improperly inflamed the passions of the jury by referring to facts not in evidence during the State's cross-examination of mitigation witnesses. He argues these cross-examination questions were prejudicial to his right to a fair trial.

During the penalty phase, the prosecution attempted to impeach J. Carr's mitigation witnesses by referencing a variety of bad acts and uncharged crimes. These included allegations that J. Carr:  (1) threatened to stab a Community Corrections employee through the neck with a pencil; (2) threatened to slam a female deputy to the ground; (3) stole his sister's pickup truck; (4) went to Ohio while under supervision without permission from Community Corrections; and (5) committed a crime in Ohio, which the prosecutor variously described as a carjacking, holding a gun to a man's head, taking a man's keys outside a convenience store, and pushing a man. In each instance, the prosecutor asked whether the witness was aware of J. Carr's prior act.

30

The prosecutor also relied on two statements J. Carr allegedly made to a fellow jail inmate while in custody and incorporated those statements into questions propounded to J. Carr's mitigation witnesses during cross-examination. One of the purported jailhouse statements implicated J. Carr as the shooter in this case. The other implicated J. Carr and R. Carr in a victim's rape.

For example, the prosecutor relied on the latter jailhouse statement (the one implicating the defendants in a victim's rape) in her cross-examination of mitigation witness Jesse Harris, an individual J. Carr met during his time in Cleveland, Ohio. On direct examination, Harris had testified that he knew J. Carr to be a fine young man. The prosecutor challenged Harris' opinion of J. Carr on cross-examination as follows.

"Q. So it would surprise you to learn that if he told another inmate that he and his—

"[Defense Counsel]: Objection, Judge. Objection to this line of inquiry. This is improper.

"THE COURT: I'm going to overrule the objection.

"Q. *That he told another inmate that he and his brother both raped one of the girls because she had a tight pussy, would that sort of bragging and that use of those words be different from the man that you saw?*

"A. Once again, I'm going to tell you, I don't know.

"Q. Would be different than what you've been telling—

"A. The only thing I can tell you, that the time I knew [J. Carr], he was a very nice young man. He never gave me and my wife no trouble. Always respect us. That's all I can tell you." (Emphasis added.)

31

The prosecutor relied on both purported jailhouse statements (the one implicating defendants in the rape and J. Carr as the shooter) during her cross-examination of expert mitigation witness Dr. Mark Douglas Cunningham. Cunningham testified he reviewed "voluminous" records about J. Carr in developing his expert opinions, including educational records, medical records, juvenile records, offense records, and disciplinary files. From these records, Cunningham opined that people like J. Carr can lack empathy. Exploring this opinion on cross-examination, the prosecutor inquired:

"Q. One of the things in your charts indicated individuals may have lack of empathy?

"A. Yes, ma'am.

"Q. And that's—for example, if—in Jonathan Carr's case, he has maybe no empathy for any of these people that were lying dead at 29th and Greenwich or for Ms. Walenta?

"A. That would be a reasonable assessment, yes, ma'am.

"Q. He doesn't care.

"A. That's correct.

"Q. *And his lack of remorse might be reflected in statements that I assume you reviewed where he said he and his brother raped the one bitch because she had a tight pussy. Would that be a reflection of lack of remorse, after the fact?*

"A. Yes, it would.

"Q. *How about in the same conversation, said he lined them up in a ditch and went—put his hand sideways and said, pop, pop, pop, in the back of the head. Would that show a lack of remorse from Jonathan Carr?*

32

"A. Yes, ma'am." (Emphases added.)

In similar fashion, the prosecutor incorporated the other prior crimes or bad acts referenced above into her cross-examination of J. Carr's mitigation witnesses.

J. Carr suggests the prosecutor's conduct is akin to arguing facts not in evidence during closing argument. However, the prosecutor's use of the challenged jailhouse comments or other prior bad acts in cross-examination questions invokes a different legal framework assessing the prosecutor's good-faith basis for her inquiries.

Generally, counsel may not make assertions of fact in questions to a witness without a good-faith basis for believing the asserted matter to be true. *State v. Cravatt*, 267 Kan. 314, 330, 979 P.2d 679 (1999). A prosecutor's duty to furnish an explicit good-faith basis for questions is triggered only upon a defense objection. *State v. Kleypas*, 272 Kan. 894, 1089-90, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004).

When the defendant fails to object, the contemporaneous objection rule, K.S.A. 60-404, generally precludes an appellate court from finding error. See *Kleypas I*, 272 Kan. at 1090. In a death penalty appeal, the contemporaneous objection rule is generally superseded by our statutory duty to notice unassigned errors under K.S.A. 2020 Supp. 21-6619(b). See *Cheever I*, 295 Kan. at 241-42. But "[w]hile . . . 21-6619(b) compels our review of all issues briefed on appeal, it does 'not require that we treat the record other than as it is presented to us.'" *State v. Robinson*, 303 Kan. 11, 219, 363 P.3d 875 (2015).

33

Here, counsel occasionally lodged an objection to this line of inquiry; but, with one exception, those objections either specified no ground or were made on a ground unrelated to the prosecutor's good faith. The absence of objection and failure to object on grounds related to the prosecutor's good faith resulted in a record devoid of facts necessary to meaningfully review this challenge. *State v. Espinoza*, 311 Kan. 435, 436, 462 P.3d 159 (2020) ("[A] factual record is required for any meaningful appellate review.").

Only when the prosecutor asked Harris about an alleged arrest for an Ohio robbery did defense counsel say it was an improper inquiry unless the State could "prove it up." One might construe this to be an objection to the prosecutor's good-faith basis for asserting the fact of the purported Ohio robbery. If so, at that point the district judge should have required the prosecution to state its good-faith basis for the question. When the district judge did not, it was incumbent on defense counsel to request additional findings or otherwise ensure an adequate record for appeal. Defense counsel made no such request. See *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020) (defendant's failure to present argument to trial court "deprived the trial judge of the opportunity to address the issue in the context of this case and such an analysis would have benefited our review"). Under these circumstances, this court simply lacks adequate information in the record to support a prosecutorial error ruling.

### 2. *Closing Arguments*

J. Carr also claims the prosecutor erred during closing argument by referencing the purported jailhouse comment implicating J. Carr as the shooter. The prosecutor argued:

> "Their participation was equal. Can you tell who the shooter is? [Temica] said that Reginald said he was. Jonathan brags about shooting them pop, pop, pop to inmates in the jail.

34

"[Defense Counsel:] Objection to that, Your Honor. That is not in evidence.

"THE COURT: I will sustain the objection. It's not in evidence.

"[Defense Counsel:] Move for a mistrial.

"THE COURT: Overruled. Disregard that comment, Members of the Jury, not mine, but the one about the statements by Jonathan Carr."

The jailhouse statement was never admitted into evidence. Thus, we easily conclude this comment was error. See *State v. Huerta-Alvarez*, 291 Kan. 247, 263, 243 P.3d 326 (2010) ("'It is well established that the fundamental rule in closing arguments is that a prosecutor must confine his or her comments to matters in evidence. When the prosecutor argues facts that are not in evidence, misconduct occurs.'").

We are also confident the error was harmless standing alone. Viewed in context, the State was not using J. Carr's alleged statement to establish he was the shooter. Rather, the State was arguing that uncertainty over who pulled the trigger should not change either defendant's sentence since they both acted with premeditation to accomplish the killings. This was the prosecutor's only reference to the jailhouse statement, and the trial judge quickly acted to abate the error in his admonition to the jury, which was consistent with his later instruction to the jury to disregard any argument or statement by counsel not supported by evidence. Any prejudicial impact was cured by the district judge's corrective action and his jury instructions. There is no reasonable possibility this misstatement alone affected the jury's ultimate conclusion about the weight of aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Kleypas II*, 305 Kan. at 316; *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-8.

### 3. *Denigration of Defense Counsel*

J. Carr argues the prosecutor improperly disparaged his counsel, Ronald Evans, by remarking, "If Mr. Evans had been at Birchwood, would he be pleased to represent Jonathan Carr?" The statement responded directly to comments Evans had made to the jury during J. Carr's closing argument.

During J. Carr's closing, after discussing aspects of J. Carr's life before the crimes, Evans described his own relationship and interactions with J. Carr.

> "I would like to talk to you just a minute about his demeanor in this trial. I work in the death penalty phase. I am in the business of representing people that have done horrible things, at least they are accused of. *But I can tell you it has been a pleasure to represent Jonathan*. He sat here. You watched him. You are entitled to observe his demeanor during this trial. He has behaved himself. He has come to court every day, unlike his brother. *And he has treated me like a gentleman. It's been my pleasure to represent him.*" (Emphases added.)

The State objected to the statements because "this type of information [is] not in evidence." The district judge overruled the objection.

In his concluding remarks to the jury, Evans returned to the subject of his interactions with J. Carr, explaining "it's been my pleasure to represent him." As noted, the prosecutor responded to these remarks by making the challenged comment during the rebuttal portion of the State's closing argument.

In general, fair comment on trial tactics is allowed in closing so long as care is taken not to denigrate opposing counsel. *State v. Crum*, 286 Kan. 145, 150, 184 P.3d 222 (2008). The prosecutor's rhetorical question—whether Evans would be "pleased" to

36

represent J. Carr if he had been at Birchwood on the night of the crimes—draws perilously close to the line between appropriate and inappropriate comments from a prosecutor. However, viewed in context, this statement remained within the wide latitude afforded prosecutors during closing arguments. The prosecutor's argument employed language that paralleled Evans' and demonstrated to jurors the contrast between the J. Carr they saw during the trial and the J. Carr that perpetrated the Birchwood crimes. Under these circumstances, we hold the prosecutor did not err.

That said, we caution prosecutors that any sort of attack or disparaging comment directed at opposing counsel during closing arguments is strongly discouraged and should not be incorporated as a trial tactic. Under different circumstances, such attacks could jeopardize the verdict.

### 4. Cumulative Prosecutorial Error

In *R. Carr II*, we held the prosecutor's errors, endorsing Pay's credibility and misstating the jury's weighing test, did not cumulatively deprive R. Carr of a fair trial. *R. Carr II*, 314 Kan. at ___, slip op. at 132 ("Given the enormity of the State's evidence supporting aggravating circumstances, the isolated nature of the comments in question, and the correcting influence of the jury instructions, we cannot see any reasonable possibility these two errors affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict."). The additional error in J. Carr's case—the prosecutor's improper reference to a fact not in evidence, which was quickly remedied and added little to the well-established fact that J. Carr fully participated in the murders—does not require a different result. We hold there is no cumulative prosecutorial error.

*Q. P18—Double Jeopardy*

For the reasons stated in our earlier decision, we do not reach the merits of this claim. *J. Carr*, 300 Kan. at 371; see *R. Carr II*, 314 Kan. at ___, slip op. at 133; *R. Carr I*, 300 Kan. at 258, 314.

*R. P19—Execution Protocol*

For the reasons stated in our earlier decision, we do not reach the merits of this claim. *J. Carr*, 300 Kan. at 371; see *R. Carr II*, 314 Kan. at ___, slip op. at 133; *R. Carr I*, 300 Kan. at 258, 314-15.

*S. Remaining Issues Unique to J. Carr*

We address two other claims unique to J. Carr: the district judge's denial of his motion for mistrial and a constitutional due process claim based on the State's cross-examination.

*1. The District Court Did Not Err in Denying the Motion for Mistrial*

J. Carr argues the district judge erred by denying his motion for mistrial, which was made immediately following the prosecutor's closing argument reference to J. Carr's alleged jailhouse admission to being the shooter. The district judge denied the motion without discussion.

Our traditional rubric for considering a motion for mistrial can be applied to such a motion brought during a penalty phase proceeding. See *Kleypas II*, 305 Kan. at 268. In *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), we set out the legal framework for analyzing a mistrial motion.

> "K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial because of 'prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution.' Applying this statute, a trial court must engage in a two-step analysis. First, the trial court must decide '"if there is some fundamental failure of the proceeding."' If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an 'injustice.' This means . . . that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. [Citations omitted.]"

In deciding whether it is impossible to proceed without an injustice after a fundamental failure in the proceedings, a court "must assess whether the fundamental failure affected a party's substantial rights, which means it will or did affect the outcome of the trial in light of the entire record." 292 Kan. at 569. The applicable degree of certainty turns on whether the failure infringes on a right guaranteed by the United States Constitution—in which case the *Chapman* harmless error analysis applies.

On appeal, a district judge's decision denying a motion for mistrial is reviewed for abuse of discretion. 292 Kan. at 550. An abuse of discretion occurs when: (1) no reasonable person would take the view adopted by the district court; (2) the ruling is based on an error of law; or (3) the exercise of discretion is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

"Applying the abuse of discretion standard of review [to a motion for mistrial], an appellate court focuses on the two questions analyzed by the trial court and asks: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?" *Ward*, 292 Kan. at 551.

"An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis [as the district court], applying K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, depending on the nature of the right allegedly affected." 292 Kan. at 570.

In this case, although it is not clear what the district judge relied on to deny the motion, we conclude the district judge did not abuse his discretion because we have already determined the error was harmless under the *Chapman* standard in our prosecutorial error analysis above. As such, any failure in the proceeding did not result in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice.

### 2. State's Cross-Examination Did Not Violate Due Process

J. Carr argues the State's cross-examination improperly referred to uncharged, unadjudicated, prior bad acts that were not relevant to prove any aggravating circumstance or to rebut proof of any mitigating circumstance. He contends these facts were unduly prejudicial and violated his rights under the Due Process Clause of the Fourteenth Amendment.

40

As set out above, this evidence included allegations J. Carr: (1) threatened to stab a Community Corrections employee through the neck with a pencil; (2) threatened to slam a female deputy to the ground; (3) stole his sister's pickup truck; (4) went to Ohio while under supervision without permission from Community Corrections; and (5) committed a crime in Ohio that the prosecutor variously described as a carjacking, holding a gun to a man's head, taking a man's keys outside a convenience store, and pushing a man. In each instance, the prosecutor asked the witness on cross-examination if he or she was aware of these acts.

There are two components to this due process challenge: (1) whether the State had a good-faith basis for the questions; and (2) whether the facts asserted in those questions were proper in the penalty-phase trial. We resolved the first component of the due process challenge in our prosecutorial error analysis above. The second component requires further discussion.

To begin with, in all but one instance, J. Carr failed to object that these questions were outside the scope for proper rebuttal or otherwise irrelevant. Normally this failure precludes appellate review under the contemporaneous objection rule, but our statutory duty to notice unassigned errors permits review of the issue in capital appeals. See *Cheever I*, 295 Kan. at 241-42.

As to the merits, we have recognized that "[i]n the penalty phase of a capital proceeding where a defendant presents evidence of a mitigating circumstance, the prosecution is permitted to cross-examine defense witnesses as to relevant facts and to introduce relevant evidence in order to rebut the existence of the mitigating circumstance." *Kleypas I,* 272 Kan. at 1093-94. But J. Carr argues his due process right to a fair trial was compromised because the incidents the prosecutor referenced in cross-

41

examination were not relevant to proving the aggravating circumstances or rebutting any mitigating evidence.

The State contends each incident was admissible to provide the jury with a more complete picture about J. Carr. Relying on *People v. Verdugo*, 50 Cal. 4th 263, 300-01, 113 Cal. Rptr. 3d 803, 236 P.3d 1035 (2010), the State contends it had the right to explore these incidents to rebut J. Carr's mitigation case once he placed his character in issue:

> "'When a defendant places his character at issue during the penalty phase, the prosecution is entitled to respond with character evidence of its own. "The theory for permitting such rebuttal evidence and argument is not that it proves a statutory aggravating factor, but that it *undermines* defendant's claim that his *good* character weighs in favor of mercy." [Citation omitted.] Once the defendant's "general character [is] in issue, the prosecutor [is] entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." [Citation omitted.] The prosecution need only have a good faith belief that the conduct or incidents about which it inquires actually took place.'"

We agree with the State that J. Carr placed his character in issue and the State's cross-examination constituted proper rebuttal. The prior acts disclosed in the prosecutor's cross-examination of J. Carr's witnesses tested J. Carr's evidence tending to show R. Carr was a corrupting influence on him; that J. Carr "predominantly got along with most people"; that J. Carr was "nice," "good," and "probably one of the nicest, polite, kind, warm, giving, [*sic*] he was the epitome of the finest young man you could find"; and that intoxication played a role in the Birchwood crimes. J. Carr's mitigation evidence suggested his conduct on the night of the capital murders was inconsistent with his general good character. And J. Carr relied on this evidence of good character as a basis for the jury's exercise of mercy and a sentence other than death.

The State limited its references to J. Carr's prior incidents to cross-examination, in which it tested the lay and expert opinions given by the mitigation witnesses. See *State v. Patton*, 280 Kan. 146, Syl. ¶ 18, 120 P.3d 760 (2005) ("The validity of pure opinion is tested by cross-examination of the witness."); see also *State v. Reed*, 300 Kan. 494, 509, 332 P.3d 172 (2014) ("If constitutional rights are not implicated, the propriety and scope of cross-examination lies within the trial judge's discretion and is reviewed on appeal for an abuse of discretion."). To paraphrase *Kleypas I*, it is clear from the way the cross-examination questions were posed that the prosecutor used the information to rebut the favorable character evidence, rather than using it as evidence J. Carr was a bad person and should be sentenced to death. See *Kleypas I*, 272 Kan. at 1094. Accordingly, there was no error.

J. Carr also claims the facts asserted in the cross-examination questions were so unduly prejudicial they rendered his trial fundamentally unfair. "The test prescribed . . . for a constitutional violation attributable to evidence improperly admitted at a capital-sentencing proceeding is whether the evidence 'so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.'" *Carr*, 577 U.S. at 123-24; *State v. Clark*, 261 Kan. 460, 477, 931 P.2d 664 (1997) ("Evidence that actually or probably brings about a wrong result under the circumstances of the case is 'unduly prejudicial.'").

Though we have already held the prosecutor's cross-examination elicited proper rebuttal evidence, we also note that J. Carr's due process claim is substantially undercut by the United States Supreme Court's disposition of the defendants' severance claim. That claim was premised on the argument that prejudicial mitigation evidence, including some of the prior incidents the prosecutor's referenced in cross-examination, would not have come in during separate trials.

The United States Supreme Court made clear the admission of such evidence did not render the proceedings fundamentally unfair and cannot serve as a basis to vacate defendants' death sentences:

> "It is improper to vacate a death sentence based on pure 'speculation' of fundamental unfairness, 'rather than reasoned judgment.' Only the most extravagant speculation would lead to the conclusion that the supposedly prejudicial evidence rendered the Carr brothers' joint sentencing proceeding fundamentally unfair. It is beyond reason to think that the jury's death verdicts were caused by the identification of Reginald as the 'corrupter' or of Jonathan as the 'corrupted,' the jury's viewing of Reginald's handcuffs, or the sister's retracted statement that Reginald fired the final shots. None of that mattered. [Citation omitted.]" *Carr*, 577 U.S. at 125-26.

The higher Court reached this determination in "light of all the evidence presented at the guilt and penalty phases relevant to the jury's sentencing determination." 577 U.S. at 124.

Extending the same rationale to this issue, we conclude the jury's death verdict in J. Carr's case also was unrelated to the State's brief references to J. Carr's prior misconduct when cross-examining mitigation witnesses. These comparatively fleeting references and the gravity of the incidents themselves paled in comparison to the facts relevant to the capital murder and the appropriate punishment for this crime. The jury did not impose the death sentence because the prosecutor raised the specter that J. Carr absconded to Ohio without permission, took his sister's pickup truck, committed a carjacking, or threatened violence in confrontations with authorities. In fact, J. Carr's own mitigation case was built on a litany of similar, or worse, descriptions of his prior conduct. According to expert mitigation witnesses, these incidents were part of a social history that made J. Carr prone to committing acts of sexual violence.

44

In sum, the prosecutor's references to these prior incidents constituted proper rebuttal. Moreover, these references did not so infect the jury's consideration of J. Carr's sentence as to amount to a denial of due process. We hold there is no error.

### T.   P21—Cumulative Error

In *R. Carr II*, we held cumulative errors identified in that opinion did not require reversal of either R. Carr's or J. Carr's death sentences. *R. Carr II*, 314 Kan. at ___, slip op. at 144. Because the errors being accumulated in J. Carr's case differ slightly from those in R. Carr's case, we provide additional analysis as it relates to J. Carr.

Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such they cannot be deemed harmless, even though individually those errors are harmless. *State v. Tully*, 293 Kan. 176, Syl. ¶ 16, 262 P.3d 314 (2011). In assessing cumulative error in a capital trial's penalty phase, the aggregation includes any errors in the guilt-phase proceedings we determine must be considered in conjunction with the penalty-phase errors. See *Kleypas II*, 305 Kan. at 346. In addition, this includes those penalty-phase errors assumed by the court. See *State v. Sean*, 306 Kan. 963, 993-94, 399 P.3d 168 (2017). We also include penalty-phase jury instruction errors raised for the first time on appeal that are not clearly erroneous. See *State v. Seba*, 305 Kan. 185, 215-16, 380 P.3d 209 (2016) (including jury instruction error in cumulative error analysis when claim of error was raised for first time on appeal and court merely assumed error occurred); *State v. Parks*, 294 Kan. 785, 804, 280 P.3d 766 (2012).

When reviewing cumulative error in a capital penalty-phase proceeding, our focus is on the errors' cumulative effect on "the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances." *State v. Cheever*, 306 Kan. 760, 799, 402 P.3d 1126 (2017) (*Cheever II*) (citing *Kleypas I*, 272 Kan. at 1087).

45

"The degree of certainty by which we must be persuaded turns on whether any of the errors infringe upon a right guaranteed by the United States Constitution. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). The overwhelming nature of the evidence is a factor to be considered, but its impact is limited. As with the prosecutorial-misconduct analysis, the question before this court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review. See *Kleypas* [*I*], 272 Kan. at 1088." *Cheever II*, 306 Kan. at 800.

We apply the *Chapman* harmless error standard because constitutional errors are present here. See *R. Carr II*, 314 Kan. at ___, slip op. at 136. Thus, we must determine whether there is a reasonable possibility the errors' cumulative effect, viewed in light of the record as a whole, affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See 314 Kan. at ___, slip op. at 136; *Cheever II*, 306 Kan. at 800-01.

As we observed in *R. Carr II*, defendants' trial was infected with one guilt-phase error, i.e., the severance error that carried over into the penalty phase. *R. Carr II*, 314 Kan. at ___, slip op. at 138; see *Kleypas II*, 305 Kan. at 346. We put this into the same "error pot" as the penalty-phase errors because the same jury heard both the guilt and penalty phase. See *Kleypas II*, 305 Kan. at 346 (excluding error of the guilt-phase proceedings in considering penalty phase cumulative error because a different jury heard the penalty phase). We also noted the guilt-phase errors we had identified in the prior decision. See *R. Carr II*, 314 Kan. at ___, slip op. at 136-37 (listing errors).

We also identified or assumed the following penalty-phase errors:  (1) denying defendants a continuance to consult with Preston about Pay's testimony and to recall Preston for surrebuttal; (2) prosecutorial error in commenting that the "truth" about defendants' PET scans came out; (3) instructing the jury to reject the death penalty if it

46

was *not* convinced the aggravating circumstances did *not* outweigh the mitigating circumstances; (4) prosecutorial error in telling the jury to impose the death penalty if the aggravating factors were outweighed by the mitigating factors; (5) failing to instruct the jury it had to find that defendants were at least 18 years old at the time of the murders to impose the death penalty; and (6) the technical, assumed error in failing to instruct the jury on possible sentences for each noncapital crime and the district court's discretion to run the sentences concurrent or consecutive.

In addition, J. Carr's penalty-phase trial was also infected by one other prosecutorial error we did not consider in R. Carr's appeal:  the prosecutor's reference to J. Carr's alleged jailhouse admission to shooting the victims—a fact outside the evidence.

In *R. Carr II*, we explained the errors common to both defendants did not require reversal, noting they did not amplify the severance problem since no error tended to favor one defendant more than the other. 314 Kan. at ___, slip op. at 138-39. There were two "subgroups" of related errors—those relating to defendants' PET scan evidence and those improperly conveying the weighing equation to the jury. 314 Kan. at ___, slip op. at 139. But there was no reasonable possibility either subgroup considered as a unit affected the jury's ultimate conclusion regarding the weight of aggravating and mitigating circumstances, i.e., the death sentence verdict. 314 Kan. at ___, slip op. at 140-41. And the remaining, independent errors did not amplify the prejudicial effect of each other or either subgroup because they were "distinct enough they cannot possibly result in prejudice when combined with any other errors." 314 Kan. at ___, slip op. at 141.

Considering the record in its entirety, we concluded the aggregate effect of these errors was harmless:

"In the final analysis, the State's aggravation case—which rested entirely on its guilt-phase evidence—was formidable. This evidence overwhelmingly established that defendants knowingly killed more than one person, for the purpose of receiving money or items of monetary value and to prevent arrest or prosecution, and that they did so in an especially heinous, atrocious, or cruel manner.

"Following the jury's guilt-phase verdicts, the penalty-phase proceeding consisted almost entirely of defense witnesses who testified over the course of nearly two weeks about the defendants' upbringing, psychological profiles, and other mitigating circumstances. *R. Carr* [*I*], 300 Kan. at 259-75. After giving due consideration to this evidence, the jury unanimously found beyond reasonable doubt that all four aggravating circumstances were present and outweighed mitigating circumstances, thereby warranting a death sentence verdict.

"Under these circumstances, we are convinced there is no reasonable possibility the identified errors, deemed harmless in isolation, cumulatively affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. To borrow again from the United States Supreme Court, given the State's evidence '[n]one of that mattered.' 577 U.S. at 126. We are satisfied the jury correctly understood its charge and was not swayed by the aggregate impact of these identified defects." 314 Kan. at ___, slip op. at 144.

The additional instance of prosecutorial error unique to J. Carr's penalty-phase trial does not warrant a different conclusion. Quite simply, the prosecutor's unsupported reference to J. Carr's alleged jailhouse admission did not amplify the other errors. There is no reasonable possibility this error, when combined with the others, affected the jury's death sentence verdict.

CONCLUSION

After careful review and consideration of the entire record, we conclude that "the evidence supports the findings that" one or more aggravating circumstances "existed

48

and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." K.S.A. 2020 Supp. 21-6619(c)(2). Having confirmed that Jonathan D. Carr received a fair trial and the jury's sentence was not "imposed under the influence of passion, prejudice or any other arbitrary factor," K.S.A. 2020 Supp. 21-6619(c)(1), we affirm Jonathan D. Carr's death sentence for the capital murder of H.M., J.B., B.H., and A.S.

* * *

BILES, J., concurring: I concur in the majority result and rationale with one exception as explained in my separate concurrence in *State v. Carr*, 314 Kan. ___ (No. 90,044, this day decided) (*R. Carr II*).

* * *

STEGALL, J., concurring: I join the majority's decision to affirm. But I do so with deep doubts and reluctance because this court's section 1 jurisprudence—begun in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019), and continued today—is a gross constitutional error. I continue to dissent from that error. See generally *Hodes*, 309 Kan. at 707-78 (Stegall, J., dissenting).

I write to explain those doubts and to emphasize that today's decision adds both clarity and dreadful effect to the egregious consequences of the *Hodes* decision. When, in *Hodes*, we abandoned our longstanding interpretation of section 1 as a limit on state police power in favor of an ephemeral scheme of limited and judicially pronounced rights, we stripped all citizens of their "first rights of republican self-rule" including the right to be "free from arbitrary, irrational, or discriminatory regulation that bears no

49

reasonable relationship to the common welfare." 309 Kan. at 753, 766 (Stegall, J., dissenting).

Indeed, having eliminated the substantive first right of a free and self-governing people, the *Hodes* court "only magnifie[d] the State and its near-limitless power." 309 Kan. at 745 (Stegall, J., dissenting). And the outcome of this fundamental change in constitutional structure is manifest anew in today's decision which reads our Constitution as giving the state nearly limitless power to punish citizens—unencumbered from any substantive check and limited only by the familiar panoply of procedural guarantees explicitly enumerated in the Kansas Constitution Bill of Rights.

It may be tempting to adopt a dismissive shrug at this outcome given the gruesome outrage of the underlying events. It would be understandable if one felt ambivalent about this magnification of state power given that the impact today falls only on two of the most brutal and coldblooded killers in the history of Kansas. But if substantive guarantees are not afforded to every single citizen—and rigorously defended no matter the circumstances—the people will not long be free.

Over the course of this court's vigorous disagreements concerning the meaning of section 1, the *Hodes* majority rather breathlessly suggested that "the dissent appears to maintain that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination," and that I wanted "a constitutional prerogative to invade the autonomy of pregnant women and exclude them from our state Constitution's Bill of Rights." *Hodes*, 309 Kan. at 650.

Far from a one-off of excessive hyperbole, the *Hodes* majority made this its thematic criticism of my articulation of our longstanding and traditional view of section 1 as a restriction on state police power. Because I interpret section 1 as a substantive due

50

process provision—that is, as a substantive limit on the power of the government rather than a discreet-rights granting provision—the majority argued I was "dismissive" of the rights of citizens. 309 Kan. at 637. My colleagues suggested my description of section 1's limits on the state's police power set "too low a bar" and would "allow[] the State to . . . intrude into all decisions." 309 Kan. at 671. According to the *Hodes* majority, I desired to leave "naked and defenseless" citizens with no recourse against the "unrestrained" power of the state which had "no practical limits" and would "intrude with impunity" against the individual. 309 Kan. at 679-80.

Of course this was a "fabrication so flimsy it makes run-of-the-mill straw men appear as fairy tale knights by comparison." 309 Kan. at 768 (Stegall, J., dissenting). At the time *Hodes* was decided, however, the majority could get away with this faulty-but-effective rhetoric because it viewed itself as standing nobly between an aggressively paternalist government and the rights of women. It has taken today's case—and likely future cases as well—to clarify what was really going on. So, I resurrect this old squabble not to pick at closed wounds, but because today's decision shines the disinfectant of sunlight on the rhetorical posture of the *Hodes* majority.

Without the benefit of that rhetorical posture, the essential effect of the *Hodes* decision is revealed to be what I explained it to be at the time—that "it fundamentally alters the structure of our government to magnify the power of the state." 309 Kan. at 707 (Stegall, J., dissenting). That shift—the magnification of state power—is enacted today as we hold that a citizen's limited section 1 rights are "forfeited when a person's criminal conduct necessitates punishment." *State v. Carr*, 314 Kan. ___ (No. 90,044, this day decided) (*R. Carr II*), slip op. at 34. Thus, the majority makes it explicit that a criminal defendant has no section 1 protections at all. Indeed, according to the majority, "the state's power to punish" is limited only by "due process" and "cruel or unusual"

51

provisions which "do not arise under section 1." *R. Carr II*, 314 Kan. at ___, slip op. at 40.

It turns out that in reality, it is the majority's interpretation of section 1 (not mine) that ends up with some citizens "relinquish[ing] virtually all rights of personal sovereignty in favor of the Legislature's determination," and "exclude[d]" from substantive constitutional protections against state exercises of power. *Hodes*, 309 Kan. at 650. If, however, section 1 is a substantive check on state power rather than a fundamental-rights-that-might-be-forfeited provision, it will always and everywhere provide the same protection to all people regardless of circumstances. And that is exactly the test I proposed in my *Hodes* dissent—a test demanded by the overwhelming weight of text, history, and longstanding judicial precedent.

I articulated that test like this:

> "In sum, section 1 demands this 'rational basis with bite' judicial inquiry. In order to be a constitutional exercise of power, *every* act of our Legislature must be rationally related to the furtherance or protection of the commonwealth. The lodestar of this test is, "'*what have* [the people] *authorized to be done?*"' *Nemaha*, 7 Kan. at 557 (Brewer, J., dissenting). The people have not authorized the State to act in arbitrary, irrational, or discriminatory ways. Applying the necessary deference, a court must examine the actual legislative record to determine the real purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State." *Hodes*, 309 Kan. at 767 (Stegall, J., dissenting).

This is the test we should now apply to the death penalty as enacted by the Kansas Legislature. I have no preconceived idea about how such an inquiry would play out. And it is one of the great misfortunes of the *Hodes* decision that we now will never know. The lower courts have not inquired into the subject, the parties have not briefed the issue, and this court has declined to take it up.

Given this uncertainty, and the monumental consequences of the state's exercise of this most final, most irreversible, and most grave use of power—killing a human person—I am left with a profound and unshakable disquiet about our court's blessing upon these procedures. As a consequence, if the issue had been joined, I would be inclined, as in *Hodes*, to remand this matter for a review of

> "whether the legislative act is reasonably related to the furtherance or protection of the common welfare. The Legislature has wide latitude to define for itself the substantive content of the common good, circumscribed by the traditional police power limit that a law cannot be arbitrary, irrational, or involve a class-based form of discrimination." *Hodes*, 309 Kan. at 769 (Stegall, J., dissenting).

But this review would demand a real judicial inquiry into "the legislative record" to determine whether it "reveals evidence of a discriminatory intent or some other arbitrary or irrational purpose behind the law" and a consideration of "the possibility that the act was not *actually* intended to further the common welfare." 309 Kan. at 770 (Stegall, J., dissenting).

I have previously explained why our constitutional structure, properly understood, does not permit a "presumption of constitutionality" to attach to legislative acts. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1158, 442 P.3d 509 (2019) (Stegall, J., concurring in part and concurring in judgment). But neither may a court presume unconstitutionality, and I will not presume our death penalty is not reasonably related to the furtherance or protection of the common good—or that it is otherwise arbitrary, irrational, or discriminatory. A party challenging an exercise of state power as exceeding the proper bounds of the police power has the burden to present that claim for adjudication. Because that has not happened here, I am left with no option other than to concur in the judgment.

* * *

LUCKERT, C.J., concurring in part and dissenting in part: In this appeal, we review a trial riddled by error that led to a verdict imposing the death penalty. The ultimate question before us is whether there is a reasonable *possibility* the cumulative effect of all errors might have affected *even one juror's* decision to impose the death penalty. See *J. Carr II*, 314 Kan. at __, slip op. at 46 (citing *State v. Cheever*, 306 Kan. 760, 799-801, 402 P.3d 1126 [2017]). Given the nature and volume of errors, I cannot eliminate the possibility that at least one juror would have decided mitigating factors or mercy outweighed the aggravating factors put forward as reasons to sentence Jonathan Carr (J. Carr) to death. I therefore dissent from the majority's determination that these many errors did not affect the jury verdict. I also dissent from some of the majority's holdings about error. I have listed and discussed these points below. I otherwise agree with most other holdings and the rationales supporting them discussed by the majority, including those relating to section 1 of the Kansas Constitution Bill of Rights.

Like the majority, my opinion covers many issues addressed in the appeal of J. Carr's codefendant, Reginald Carr (R. Carr). See *State v. Carr*, 314 Kan. ___ (No. 90,044, this day decided) (*R. Carr II*). And, like the majority, I consider many issues raised by only R. Carr as unassigned errors applicable to J. Carr's appeal under K.S.A. 2020 Supp. 21-6619(b). I have also considered several claims made by J. Carr that are unique to his appeal. The result is a long list of errors. My research reveals no other Kansas appellate case affirming a verdict in the face of so many mostly interlocking errors. In *State v. Carr*, 300 Kan. 340, 329 P.3d 1195 (2014) (*J. Carr I*), *rev'd and remanded on other grounds* 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (*Carr*), this court found eight errors in the guilt phase of J. Carr's trial. See 300 Kan. at 356-60 (summarizing holdings).

54

1. The trial judge erred in refusing to allow a defendant to exercise a peremptory challenge;
2. The trial judge erred in refusing to sever J. Carr's trial from R. Carr's trial;
3. The trial judge erred in admitting Linda Ann Walenta's statements through law enforcement testimony;
4. The trial judge gave a faulty instruction on the sex-crime-based capital murders;
5. Three of the multiple-homicide-based capital murder convictions were multiplicitous with the first;
6. The district court lacked subject matter jurisdiction over any sex crime charges based on coerced victim-on-victim sex acts;
7. The trial judge erred by automatically excluding testimony from an expert on the reliability of eyewitness identifications;
8. The trial judge erred by giving an aiding and abetting instruction that discussed foreseeable crimes; and
9. One count of rape by digital penetration is muliplicitous with another.

I joined a concurring and dissenting opinion that found additional errors and would have held cumulative error required reversing the jury verdicts. *J. Carr I*, 300 Kan. at 372.

The other errors were that:

10. The evidence was insufficient to support J. Carr's conviction of rape of one victim through digital self-penetration; and
11. The district judge erred by refusing to grant a mistrial when the opening statement by R. Carr's counsel implicated J. Carr and another unknown man as the perpetrators of the Birchwood crimes.

55

Considering the cumulative effect of these errors, I joined others in saying:

"[T]wo of the district judge's errors—failure to sever the guilt phase of the defendants' trial and rejection of the reverse *Batson* peremptory challenge—may have been reversible standing alone. Even if the court is unwilling to go that far today, when these two errors are considered with the six other J. Carr errors upon which the court unanimously agrees—erroneous instructions on the sex-crime based capital murders, multiplicity of the multiple-homicide based capital murders, lack of subject matter jurisdiction for the victim-on-victim sex charges, automatic exclusion of expert testimony on the reliability of eyewitness identifications, erroneous instruction on eyewitness certainty, and erroneous instruction on aiding and abetting—and Judge Paul Clark's refusal to grant J. Carr's motion for mistrial after opening statements, reversal of all of J. Carr's convictions under the cumulative error doctrine is unavoidable. Despite weighty evidence, there was simply too much pervasive and interrelated error in the guilt phase of J. Carr's trial for me to be confident in the outcome." 300 Kan. at 372 (Beier, J., concurring in part and dissenting in part).

Nothing has changed that conclusion about the cumulative impact of those errors. While the United States Supreme Court rejected the constitutional basis for finding some errors, it did not consider the state law basis for those same errors. Plus, it considered only a small fraction of many errors we must consider, and it thus did not consider the effect of the multiple, interlocking errors.

As the majority observes, we must put all these errors "into the same 'error pot' as the penalty phase errors because the same jury heard both the guilt and penalty phase." 314 Kan. at ___, slip op at 46.

Two of these errors heavily tainted the penalty phase of the trial, which is the focus of today's majority decision.

As to one of those errors, this court unanimously held that the trial judge committed error by seating a juror after R. Carr exercised a peremptory challenge to the juror—that is, after R. Carr asked to strike a juror from the jury panel using a challenge allowed under Kansas law. See *State v. Carr*, 300 Kan. 1, 45, 124-39, 331 P.3d 544 (2014) (*R. Carr I*), *rev'd and remanded on other grounds sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (*Carr*). The State objected, and the trial judge sustained the objection and did not allow the defendants to exercise a peremptory challenge to this prospective juror.

The trial judge's error in refusing to allow the defendants to strike a juror permeates and taints all aspects of the trial because "[t]he proper use of the peremptory challenge is vital to the conduct of a criminal defendant's defense. . . . Although it may seem minimal, the deprivation of even one valid peremptory challenge is prejudicial to a defendant and may skew the jury process." *State v. Foust*, 18 Kan. App. 2d 617, 624, 857 P.2d 1368 (1993). When this court first decided J. Carr's guilt phase issues, 16 of our sister states had held such an error demands automatic reversal. See *R. Carr I*, 300 Kan. at 135-36 (discussing cases); 300 Kan. at 318 (Beier, J., concurring in part, dissenting in part) (same). I need not decide whether I would join the reasoning of those courts. Even applying our traditional tests to determine whether an error requires reversal, I cannot say the trial court's error did not impact the jury's verdict. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (stating harmless error standards for constitutional and statutory errors).

The trial judge often "provided venire persons with the magic words" that led to a challenge for cause of those with misgivings about the death penalty and "passing for cause those jurors who were predisposed to finding the defendant guilty and/or were mitigation-impaired with respect to the death penalty." *R. Carr I*, 300 Kan. at 325-26

(Johnson, J., concurring in part and dissenting in part). "Instead of uncovering disqualifying bias and prejudice, the voir dire questioning in this case too often served to camouflage it." 300 Kan. at 326 (Johnson, J., concurring in part, dissenting in part). Given this record, denying the defendants the ability to use a peremptory strike deprived them of "one of the very purposes of peremptory challenges[, which is] to enable the defendant to correct judicial error." *United States v. Martinez-Salazar*, 528 U.S. 304, 319, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000) (Scalia, J., concurring). Plus, "[p]eremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of 'eliminat[ing] extremes of partiality on both sides,' . . . thereby 'assuring the selection of a qualified and unbiased jury.'" *Holland v. Illinois*, 493 U.S. 474, 484, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990) (quoting *Batson v. Kentucky*, 476 U.S. 79, 91, 98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986]). Here, we have no such assurance.

Simply put, denying fair use of the right to exercise a peremptory challenge creates a reasonable possibility, and even a reasonable probability, that a properly selected juror untainted by an erroneous voir dire process could have decided not to impose the death penalty. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (stating harmlessness tests in terms of reasonable possibilities for constitutional harmless error and probabilities for other errors).

As to the second error with a significant effect on the penalty phase, this court held the trial judge erred in refusing to grant R. Carr and J. Carr separate trials. *R. Carr I*, 300 Kan. at 45, 97. On appeal, the United States Supreme Court held the failure to sever the trial did not implicate the Eighth Amendment to the United States Constitution or offend the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Carr*, 577 U.S. at 122-26. But that holding did not directly disturb this court's ruling that the trial judge committed error under Kansas law when he refused to grant the request for

separate trials. *R. Carr II*, 314 Kan. at ___, slip op. at 58-59. Today, the majority recognizes the state law holding remains the law of the case, and it holds that "[t]he improper joinder of the defendants did not cease to be error at the commencement of the penalty phase." *R. Carr II*, 314 Kan. at ___, slip op at 59.

The antagonistic nature of R. Carr's and J. Carr's defense was made clear from the opening statements of the guilt phase of the trials. R. Carr's attorney told jurors that the evidence would show that J. Carr and another uncharged man committed the crimes and R. Carr merely stored stolen property for his brother. J. Carr objected, and the trial judge overruled the objection. During the same opening, R. Carr's attorney again pointed the finger at J. Carr, saying lab results revealed J. Carr's DNA at one of the crime scenes. He added, "Ultimately, the DNA evidence will show that Jonathan Carr, not Reginald Carr, Jonathan Carr committed most, if not all of the crimes which are alleged in the complaint and that he did it with a third black male who still walks the streets of Wichita." The State objected at this point, arguing R. Carr's attorney violated the judge's pretrial rulings on motions in limine. The State asked the judge to sanction R. Carr's attorney. J. Carr asked for a mistrial. The judge agreed the argument was inappropriate but did not impose sanctions or grant a mistrial. At this point, if not before, the antagonistic nature of R. Carr's and J. Carr's defense was evident. *J. Carr I*, 300 Kan. at 362. In addition, J. Carr was unable to introduce some evidence because of confrontation issues related to R. Carr.

The finger pointing continued throughout the trial. Kansas law protects a defendant from having to counter the case of a codefendant as well as that of the State. *State v. Martin*, 234 Kan. 548, 673 P.2d 104 (1983). I agree with the result of *Martin* and other cases that have found this type of antagonistic finger pointing to be prejudicial error. See, e.g., *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995); *Foster v. Commonwealth*, 827 S.W.2d 670 (Ky. 1992). I would hold that the trial judge should have recognized a fundamental failure in the proceedings had occurred during the

opening statements and should have declared a mistrial and sworn in two juries to hear the separate trials of J. Carr and R. Carr.

While I find these two errors, along with the cumulative effect of the other guilt phase issues, to be sufficient for reversal, today, focusing on the penalty phase of the trial, this court unanimously held six more errors relevant to J. Carr's defense occurred or would be assumed:

1. The trial judge erred in denying the defendants a continuance to consult with Dr. David Preston about Dr. Norman Pay's testimony and to recall Preston for surrebuttal;
2. The prosecutor committed error in commenting that the "truth" about defendants' PET scans came out;
3. The trial judge erred in instructing the jury to reject the death penalty if it was not convinced the aggravating circumstances did not outweigh the mitigating circumstances;
4. The prosecutor erred in telling the jury to impose the death penalty if the aggravating factors were outweighed by the mitigating factors;
5. The trial judge erred in failing to instruct the jury it had to find defendants were at least 18 years old at the time of the murders to impose the death penalty;
6. Assumed error occurred as a result of the trial judge failing to instruct the jury on possible sentences for each noncapital crime and the judge's discretion to run the sentences concurrent or consecutive; and
7. The prosecutor erred in telling the jury J. Carr allegedly made a jailhouse admission that he shot the victims—a fact outside the evidence. *J. Carr II*, 314 Kan. at ___, slip op. at 46-47.

60

I would add an error to the list. Under the law that existed at the time of J. Carr's trial, the trial judge should have informed the jury that mitigating factors need not be proved beyond a reasonable doubt. In 2001, this court directed trial judges to tell the jury that mitigating circumstances

"(1) . . . need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." *State v. Kleypas*, 272 Kan. 894, 1078, 40 P.3d 139 (2001).

J. Carr asked the trial judge to comply with this direction, but the judge failed to do so.

In part, the *Kleypas* rationale for requiring this instruction depended on constitutional interpretation rejected by the United States Supreme Court in *Carr*, 577 U.S. at 122. But the *Kleypas* rationale also depended on state law. As this court explained in *State v. Scott*, 286 Kan. 54, 106-07, 183 P.3d 801 (2008), without an instruction as directed by the *Kleypas* court, the instructions could have confused the jury. That confusion, the *Scott* court held, required reversal. In reversing, this court applied the standard we use when an error does not implicate the Constitution:

"Read together, the instructions repeatedly emphasize the need for unanimity as to any aggravating circumstances found to exist. Conversely, the trial court's instructions do not inform the jury as to a contrary standard for determining mitigating circumstances. The jury is left to speculate as to the correct standard. Under these circumstances, we conclude there is a substantial probability reasonable jurors could have believed unanimity was required to find mitigating circumstances." 286 Kan. at 107.

61

The *Scott* court's application of the substantial probability standard for harmless error suggests that it was not finding constitutional error. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (stating constitutional harmless error test); see also 292 Kan. at 564 (noting that cases before *Ward* inconsistently stated the standard). Rather, the court looked at the potential for juror confusion. Although today's majority does not discuss *Scott*, when it discusses this issue in *R. Carr II*, it notes that this court explicitly recognized that *Kleypas*' directive rested, in part, on state law and thus remained the law despite the Supreme Court clarifying the holding could not rest on Eighth Amendment grounds. See *R. Carr II*, 314 Kan. at ___, slip op. at 51-52 (discussing *State v. Gleason*, 305 Kan. 794, 798-806, 388 P.3d 101 [2017]; *State v. Cheever*, 306 Kan. 760, 784, 402 P.3d 1126 [2017]). But the majority abandons the *Kleypas* directive and holds that the trial judge did not err when he refused to give an instruction directed by this court. *R. Carr II*, 314 Kan. at ___, slip op. at 56.

To the contrary, in my view, for a trial court to simply ignore a directive of this court is itself error. See *State v. Clark*, 313 Kan. 556, 565, 486 P.3d 591 (2021) ("'[P]oints of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised.'"). And the majority does not hold the directed instruction would misstate the law. Instead, it determines "[t]he instructions viewed together as a whole correctly and clearly informed the jurors of the law governing their consideration of mitigating circumstances." *R. Carr II*, 314 Kan. at slip op. at 56. Granted, we often hold a court does not err when it refuses to give a requested instruction that provides additional information to a jury even if the instruction would properly explain the law. But we often tell trial judges that giving the jury added information would be a better practice. See, e.g., *State v. Barlett*, 308 Kan. 78, 86, 418 P.3d 1253 (2018). And in *Kleypas*, 272 Kan. at 1078, this court took the added step of directing judges to give the instruction.

Those with legal training may find the jury instructions clear. But jurors usually lack legal training and familiarity with concepts like burden of proof and weighing equations. I, like the many justices of the Kansas Supreme Court who have considered these instructions many times over the last several decades, discern ambiguity that could confuse and mislead jurors as they perform the important task of weighing aggravating and mitigating circumstances. That confusion was rampant in this trial, including among the law trained. The majority agrees the trial judge erred in instructing the jury to reject the death penalty if it was not convinced the aggravating factors did not outweigh the mitigating factors. It also held the prosecutor erred in telling the jury to impose the death penalty if the aggravating factors were outweighed by the mitigating factors. The weighing equation and the way it is to be applied can be confusing. We should recognize that reality and direct our trial courts to provide as much clarity as possible rather than to cloak decisions about death in ambiguity.

Yet the majority quickly dismisses the effect of these errors. Although it notes "these errors are related," it concludes "they do not magnify one another because they misstated the law in different ways." *R. Carr II*, 314 Kan. at ___, slip op. at 141. But differing statements simply magnify the potential confusion. Which of all the options is correct? The majority defaults to the written word found on the verdict form. *R. Carr II,* 314 Kan. at ___, slip op. at 141. But we have another written instruction that is wrong. Which written word controls? We should not tolerate this level of confusion when sentencing someone to death.

When I consider the penalty phase errors together with the guilt phase errors, I am convinced the threshold for vacation of the defendant's capital sentence has been reached under the cumulative error doctrine. We consider here horrible and tragic criminal acts. And the evidence against J. Carr was strong. But as said in Justice Beier's prior concurrence and dissent in R. Carr's appeal, which I joined, "it was not inevitably

63

invincible." *R. Carr I*, 300 Kan. at 319. And, especially as to the penalty phase, I cannot ignore the reasonable possibility a properly selected jury—actually two properly selected juries—might have reached a different verdict.

For these reasons, I respectfully dissent from the outcome reached by a majority of this court.